Filed 5/12/25 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANDREW CHRISTIAN TEMPLE,<br><br>    Defendant and Appellant. | G062781<br><br>(Super. Ct. No. SWF1907858)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |


It is ordered that the opinion filed on May 6, 2025, be modified as follows:

Page 1, beginning of third paragraph "Rob" should read "Rob Bonta"

Page 2, first paragraph, second to last sentence should read "On the verdict form, the jury found to be true the allegations that, in the commission of the offense, Temple used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and that, in the commission of the offense in Count 1, (murder), he personally inflicted great bodily injury on the victim (§§ 12022.7, subd. (a), 1203.75, subd. (a).)

Page 7, last line "and try to gouge" should read "and gouge"

Page 9, first full paragraph, line 3, "Temple make a diagnosis" should read "Temple and make a diagnosis"

Page 11, last line, "his mental defect disease or disorder" should read "his mental defect, disease, or disorder"

Page 13, first full paragraph, line 3, "or amplification or those" should read "or amplification of those"

Page 24, third full paragraph, line 2, "Defense counsel" should read "defense counsel"

There is no change in the judgment.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


DELANEY, J.

Filed 5/6/25 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANDREW CHRISTIAN TEMPLE,<br><br>    Defendant and Appellant. | G062781<br><br>(Super. Ct. No. SWF1907858)<br><br>O P I N I O N |


Appeal from a judgment of the Superior Court of Riverside, Timothy J. Hollenhorst, Judge. Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob , Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Paige B. Hazard and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

INTRODUCTION

A jury found Andrew Christian Temple not guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a))[1] but guilty of the lesser included offense of second degree murder (§ 189, subd. (b)). The jury found to be true the allegations that Temple used a deadly and dangerous weapon—a knife—in the commission of the offense (§ 12022, subd. (b)(1)) and that he personally inflicted great bodily injury on the victim (§ 12022.7). The trial court sentenced Temple to a prison term of 16 years to life.

On appeal, Temple contends: (1) the trial court did not correctly instruct the jury that it could consider evidence of his mental disorders in determining whether he acted in imperfect self-defense; (2) the trial court erred by instructing the jury with CALCRIM No. 225 instead of CALCRIM No. 224; and (3) the trial court erred by denying his counsel's motion for a trial continuance to locate a material witness.

We affirm. As to the first contention, the trial court instructed the jury with CALCRIM No. 571 (imperfect self-defense) and CALCRIM No. 3428 (consideration of evidence of a mental disease, defect, or disorder). Temple argues those instructions were erroneous because they did not inform the jury it could consider evidence of his mental condition in determining whether he acted in imperfect self-defense. We conclude any instructional error was harmless. A claim of imperfect self-defense can be lost if the defendant used more force than was reasonably necessary to repel the attack, failed to take advantage of an opportunity to retreat, or continued using force after the perceived danger no longer existed. Here, the evidence that Temple used unreasonable force, failed to retreat, and continued using force after the

---

[1] All further statutory references are to the Penal Code.

danger no longer existed was so strong that it is not reasonably probable the jury would have found he acted in imperfect self-defense in absence of the claimed instructional error.

As to the second contention, the trial court did not err by giving CALCRIM No. 225 because Temple's mental state was the only element of the offense that rested substantially on circumstantial evidence. Finally, the trial court did not err by denying Temple's motion for a trial continuance because no indication was given that the witness could be located within a reasonable time.

FACTS

I.

*Temple Kills David Deschepper*

In December 2019, Temple, Vanessa Marquez, David Deschepper, Jerrad Drellishak, Ben Gilano, and Sarah Emmitt were part of the homeless community in Temecula, California. Marquez was Deschepper's girlfriend.

On December 19, 2019, at a Del Taco in Temecula, Gilano introduced Temple to Marquez and Deschepper. Gilano offered to rent a motel room, and Marquez agreed to let him use her identification so that she and Deschepper could stay in the room too. Temple drove Gilano, Marquez, and one other person down the street to the Motel 6, where they rented a room toward the back, on the upper floor. Deschepper was supposed to follow them on his bicycle, but he did not show up.

By the evening of December 20, there were nine people in the motel room. Many were abusing drugs. The motel management had received a noise complaint and told Marquez she could not have so many people in the room, otherwise she would be banned from staying there. Temple, who was

3

among those in the motel room, said that if there were too many people in the room he was "'just going to have to start stabbing people.'"

Deschepper showed up at the motel room in the small hours of December 21, 2019. Outside the motel room, Marquez and Deschepper got into an argument after she asked him where he had been. Deschepper yelled at Marquez and accused her of engaging in oral sex with someone in the room.

Deschepper became angry and pushed his way into the motel room. Temple, who was in the room at the time, became agitated and upset with Deschepper. Temple said it was disrespectful for Deschepper to come in because the motel management would shut down the room. Temple said he had a knife with a 12-inch blade and "people wouldn't be so disrespectful if they knew about it."

Deschepper left the motel. Marquez followed him out after arguing with Gilano over the mess made by the occupants of the room. Temple left the room by himself a few minutes later.

As Marquez walked toward Deschepper, whom she spotted standing near the front of the motel, she realized she had left her purse in Temple's car. She stopped and turned to walk back to the car to get the purse.

Temple met up with Marquez in the parking lot. She told him she wanted to get her purse out of his car. Temple said he was going to take Marquez to her mother's house. Marquez replied, "'No, I just want my purse.'" As Temple started opening the passenger door to his car, Deschepper walked up and asked, "'Where are we going?'" Temple told Deschepper, "'I'm taking her home.'" Deschepper used both hands to shove Temple in the chest. Temple grabbed onto Marquez's arms and they both started to fall.

4

Before she could hit the ground, Marquez flung herself up, threw her arms around Deschepper, and told him, "'Baby, I was just getting my purse.'" Deschepper, who was facing Temple, immediately exclaimed with a look of horror, "'He has a knife.'" Marquez, turned right and saw Temple, holding a knife, coming from behind her. Deschepper pushed Marquez to the side. Temple approached Deschepper and stabbed him. Marquez jumped onto Temple to try to get him off of Deschepper. She was screaming "'[s]top it . . . [s]top it,'" but Temple continued to stab Deschepper.

Marquez was pulling on Temple and he was dragging her across the parking lot. When they were halfway across the parking lot, Deschepper said, "'He's stabbing me. He's stabbing me.'" Deschepper then fell to the ground, creating a gap between Temple and him. Marquez used the opportunity to try to throw herself over Deschepper to shield him and with the hope Temple would stab her and leave Deschepper alone. Temple climbed on top of Deschepper and kept stabbing him. Deschepper did not fight back. Temple lifted the knife above his head and used both hands to plunge it into Deschepper's back.

Marquez finally managed to hit Temple in the face and kicked him in the chest. Temple was thrust back and hit the concrete. He got up, turned around, and left.

Although Marquez could see no injuries or blood on Deschepper; he was barely breathing and not moving. Marquez screamed for somebody to call 911.

Deschepper died of exsanguination (he bled to death) resulting from multiple stab wounds. An autopsy revealed that Deschepper had suffered five stab wounds. Either a stab to Deschepper's left shoulder, which

5

penetrated seven and quarter inches or a stab to the left lateral mid-back, which penetrated eight inches, could have been the fatal blow.

## II.

### *Law Enforcement Interviews*

At 2:00 a.m. on December 21, Riverside County Sherriff's Deputy Stamatelatos arrived and found Deschepper lying face down in the Motel 6 parking lot. Other sheriff's deputies arrived on scene and assisted Stamatelatos in performing life-saving efforts until paramedics arrived.

Near Deschepper's body was found a wallet containing Temple's California identification card. Between two nearby vehicles, sheriff's deputies found a bloodied kitchen knife with a blade approximately six inches in length.

Riverside County Sherriff's Deputy William Churchill also was dispatched to the Motel 6 in Temecula at 2:00 a.m. on December 21, 2019. While on his way to the Motel 6, Churchill had to slam on the brakes to avoid hitting Temple, who was crossing the road. Churchill rolled down the patrol car window and Temple, who had blood on his right pant leg, started talking about being involved a fight and having stabbed somebody in self-defense. Churchill got out of the patrol car, placed Temple in handcuffs, and patted him down for weapons. Temple complained of having a headache and said he had been hit in the head more than once, his hair had been pulled, and he had been dragged to the ground.

In a videorecorded interview, Temple told Churchill that people at the Motel 6 were trying to attack him. Temple told Churchill, "Just because I'm [with] his girlfriend, he [Deschepper] runs up and he says, oh, where are we going?" . . . [H]is girlfriend's right there. And she has her bag [in the] car. And as I'm opening the fucking door, he comes up and hits me

6

with his right fist in my left side of my face." Moments later, Temple continued: "[A]fter he sucker punched me, I, I lashed, lashed backwards. . . . [¶] . . . [¶] I regained, I stumbled back, and he started [¶] . . . [¶] This guy who fuckin' sucker punches me, he fuckin' tries to drag me down and shit. [¶] . . . [¶] You think I'm not gonna fuckin' defend myself, you fuckin' must be dumb." Temple claimed his hand had been cut "when [inaudible] had my fuckin' knife."

After receiving medical treatment and being cleared for booking at a hospital, Temple was transported to a sheriff's station, where he was booked and read his *Miranda* rights, which he understood and waived. Sheriff's investigator Jarred Bishop and detective Navarette interviewed Temple. Temple told them he had been living in his car and "couch surfing" for the last few weeks. Temple said he used methamphetamine once a week and had last used it the day before in the morning.

Temple claimed that Deschepper had sucker punched and tried to kill him. Temple told Bishop and Navarette that he was by his car speaking with Marquez when Deschepper approached and asked in a friendly manner, "'Oh, oh where are we going?'" Before Temple had a chance to answer, Deschepper hit him with a "haymaker" and then "pummeled" him "with perpetual blows." Temple said that Deschepper hit him "[t]oo many times to count" causing Temple to lose consciousness and fall to the ground. Temple claimed that when he regained consciousness, Deschepper was grabbing his hair and hitting him in the jaw, head, stomach, and "everywhere" until "God intervened" and lifted Temple off the ground.

Temple said he then took his knife out his coat pocket and started stabbing, and stabbed Deschepper five times. Deschepper fell to the ground but continued trying to grab Temple and try to gouge his eyes out.

7

Temple claimed he stopped stabbing Deschepper after the threat had "subdued" but then said he stabbed Deschepper once or twice while he was on the ground. Moments later in the interview, Temple said he did not think he stabbed Deschepper while he was on the ground. Temple said he ran into the Motel 6 office and told them to call the police and then started running toward the police station.

III.

*Surveillance Video Recording*

Investigators obtained surveillance video from the Motel 6, which had two video surveillance systems with more than 30 cameras. The cameras were motion-activated, meaning they only recorded when movement was detected. At trial, the prosecution played a DVD with a one-minute, one-second clip from camera 13 and a 49-second clip from camera 15. The DVD has three files, one for each camera and one combining footage from both cameras to present the footage in time sequence.

The footage from camera 13 shows the upstairs balcony where the rented room at the Motel 6 was located. To the left is the motel parking lot. Two blurry figures can be seen moving to the left and downwards across the parking lot and then out of view. The footage from camera 15 shows the section of the parking lot into which those figures were moving. After about a nine-second gap between the footage from camera 13 and camera 15, the footage from camera 15 shows a figure (Deschepper) retreating across the parking lot with another figure (Temple) pursuing him. A third figure (Marquez) is seen chasing Temple and trying to stop him. The footage shows Deschepper falling, Temple climbing on top of him and making stabbing motions, and Marquez trying to stop Temple. Marquez appears to place

8

herself on the ground between Deschepper and Temple. After what looks like a kicking motion by Marquez, Temple gets up and walks away.

IV.

*Evidence of Defendant's Mental Condition*

Francisco Gomez, Ph.D., a licensed forensic clinical psychologist and neuropsychologist was asked to conduct a psychological evaluation of Temple make a diagnosis of his mental disorders. Dr. Gomez met with Temple for five hours and also reviewed the audiotape of his law enforcement interview, his medical records, psychiatric records until junior high school, psychiatric records from the jail where he was housed at the time of trial, and the autopsy report.

Dr. Gomez diagnosed Temple as having bipolar II disorder, alcohol abuse disorder, and amphetamine abuse disorder. Any one of those disorders can impair impulse control, judgment, and problem-solving ability. Dr. Gomez testified that while Temple was in jail awaiting trial he was diagnosed with bipolar II disorder, he had been diagnosed at an early age as having attention deficit disorder, and he had developed depression while in high school. Dr. Gomez noted that Temple had a history of drug and alcohol abuse, and he self-medicated with alcohol and methamphetamine to relieve the symptoms of attention deficit disorder and depression.

## DISCUSSION

### I.

### ANY ERROR IN THE JURY INSTRUCTION ON IMPERFECT SELF-DEFENSE OR USE OF MENTAL STATE EVIDENCE WAS HARMLESS

*A. Background*

At trial, Temple asserted alternate theories of self-defense and imperfect self-defense. At the request of defense counsel, the trial court instructed the jury with CALCRIM No. 571, on imperfect self-defense, and CALCRIM No. 3428, regarding consideration of evidence of a defendant's mental disease, defect, or disorder. Temple argues giving those instructions without modification was error because they did not expressly tell the jury it could consider his mental disorders in determining whether he acted in imperfect self-defense; that is whether his mental disorders negated malice.

The trial court instructed the jury with CALCRIM No. 520, the standard instruction on murder. CALCRIM No. 520, as given in this case, recited the elements of murder as follows: (1) "The defendant committed an act that caused the death of another person"; (2) "[w]hen the defendant acted, he had a state of mind called malice aforethought"; and (3) "[h]e killed without lawful excuse or justification." CALCRIM No. 520 explains that malice can be either express or implied.

The trial court instructed the jury with CALCRIM No. 571, on imperfect self-defense, in relevant part, as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-

10

defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant."

Although CALCRIM No. 571 does not state that imperfect self-defense negates malice, it does state that imperfect self-defense reduces murder to voluntary manslaughter, which is the result of that negation.

The court also instructed the jury with CALCRIM No. 3428, as follows: "You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: *malice aforethought*. If the People have not met this burden, you must find the defendant not guilty of first or second degree murder." (Italics added.)

Temple argues these instructions failed to convey to the jurors that they could consider the evidence of Temple's mental disorders on the issue of imperfect self-defense or that imperfect self-defense operates to negate malice. That is because, Temple argues, CALCRIM No. 3428 instructs the jury it could consider his mental defect disease or disorder only to

11

determine malice aforethought, and the imperfect self-defense instruction does not mention malice aforethought or its negation. "As a result," Temple argues, "jurors who read CALCRIM No. 3428 would have no way of understanding that they could consider [Temple]'s mental disorders in assessing whether he honestly believed his life was in danger or that deadly force was necessary to defend against that danger."

*B. Forfeiture*

Defense counsel requested the trial court to give both CALCRIM No. 571 and CALCRIM No. 3428 and, at the jury instruction conference, did not request a modification to either instruction. The Attorney General argues that, as a consequence, Temple forfeited his claim of instructional error.

The general rule is that a defendant may raise for the first time on appeal a claim that a jury instruction erroneously states the law if the error affects the defendant's substantial rights. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428.) A defendant may not claim on appeal that a jury instruction which correctly states the law is incomplete, misleading, or too general unless the defendant had requested clarification or amplification of the instruction in the trial court. (*Ibid.*; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) Failure to request a clarification results in forfeiture of any challenge to the instruction. (*People v. Simon* (2016) 1 Cal.5th 98, 143.)

CALCRIM No. 571 is an accurate statement of the law of imperfect self-defense. (*People v. Howard* (2024) 104 Cal.App.5th 625, 662; *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306–1307.)[2] CALCRIM

---

[2] An appellate court independently reviews a claim of instructional error. (*People v. Lewis* (2023) 14 Cal.5th 876, 900.) "'An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.'" (*Ibid.*)

12

No. 3428 is an accurate statement of the law on how the jury is to consider evidence of a mental disease, defect, or disorder. (Pen. Code, § 28.) CALCRIM No. 3428 given in this case accurately informed the jury it could consider evidence of Temple's mental disease, defect or disorder in deciding whether he acted with malice aforethought. Neither CALCRIM No. 571 nor CALCRIM No. 3428 as given omits an element.

Temple argues, in effect, the trial court should have modified, clarified, or amplified CALCRIM Nos. 571 and 3428. His failure to request modification, clarification, or amplification or those instructions should mean he forfeited his claim of instructional error. However, an exception to the basic forfeiture rule is, "an appellate court may review any instruction, even when there was no objection or request for modification below, 'if the substantial rights of the defendant were affected thereby.'" (*People v. Johnson* (2016) 62 Cal.4th 600, 638, quoting Pen. Code, § 1259.) A defendant's substantial rights would be affected if the defendant's challenge to the jury instructions prevailed. (*Johnson,* at p. 638.)

If Temple were correct that the trial court erred by failing sua sponte to modify CALCRIM Nos. 571 and 3428 in the way he claims was necessary, and the error were prejudicial, then of course his substantial rights would be affected. We conclude, however, any possible error was harmless.

*C. Harmless Error*

1. The Standard of *People v. Watson* Applies

Temple's claim of instructional error is subject to the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407 [*Watson* standard applies to claim of error by failing to instruct the jury it could consider evidence of defendant's mental

13

disabilities in deciding whether defendant had the state of mind required for imperfect self-defense]; see *People v. Gonzalez* (2018) 5 Cal.5th 186, 195–198 [failure to instruct on lesser included offenses of voluntary manslaughter and involuntary manslaughter are subject to *Watson* harmless error standard].) The challenged instructions do not amount to a constitutional violation, such as misdescribing of an element of the offense, relieving the prosecution of its burden of proving an element of the crime, or completely depriving the defendant of a defense. (*People v. Schuller* (2023) 15 Cal.5th 237, 251; *People v. Hendrix* (2022) 13 Cal.5th 933, 942; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089 (*Humphrey*).)

Under the *Watson* standard, an error is deemed harmless unless it is "reasonably probable" the outcome would have been different in the absence of the error. (*Watson, supra*, 46 Cal.2d at p. 836.) "In determining whether there was prejudice [under *Watson*], the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

The issue of excessive force was not raised in the appellate briefs so we invited the parties to submit letter briefs addressing whether the appellate record supported a finding that Temple used excessive force against Deschepper and, considering the evidence of the amount of force used by Temple against Deschepper, whether the claimed instructional error was harmless under the standard of *Watson, supra*, 46 Cal.2d 818 and under the standard of *Chapman v. California* (1967) 386 U.S. 18. We have considered the letter briefs filed by Temple and the Attorney General in response to our invitation.

14

2. Excessive Force Can Defeat a Claim of Imperfect Self-Defense

We first address the issue whether use of excessive force can defeat a claim of imperfect self-defense. Temple argues in his  letter brief that "when a defendant employs excessive force while acting with an actual but unreasonable belief that he is in imminent danger of great bodily injury or death and he kills the victim, he can be found guilty of nothing greater than voluntary manslaughter if the victim was the initial aggressor." We hold otherwise.

Self-defense may be "'perfect'" or "'imperfect.'"  ( *Humphrey, supra*,13 Cal.4th at p. 1082.) Perfect self-defense results in a defendant's complete exoneration. (*Ibid*.) Imperfect self-defense negates the mental state of express malice. (*People v Soto* (2018) 4 Cal.5th 968, 973.) Imperfect self-defense, by negating malice, means a defendant cannot be convicted of murder but can be convicted of voluntary manslaughter. (*Humphrey,*  at p. 1082.)

Imperfect self-defense arises when a defendant acts with a subjectively honest but objectively unreasonable belief that he or she is in imminent danger of death or great bodily injury. (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.'" (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.)

Self-defense is limited to the use of force that was reasonably necessary to defend against the danger or repel the attack. (*People v. Clark* (2011) 201 Cal.App.4th 235, 250 (*Clark*); *People v. Clark* (1982) 130 Cal.App.3d 371, 380, disapproved on another ground in *People v. Blakeley*

(2000) 23 Cal.4th 82, 92; see CALCRIM No. 3470.) "[A] defendant may use force only as long [as] the danger exists or reasonably appears to exist." (*Clark,* at p. 250.)

As stated in *People v. Valencia* (2008) 43 Cal.4th 268, 288, "[t]he concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined." The court in *Valencia* gave, as an example of such intertwining, the situation in which a defendant through his own wrongful conduct "has created circumstances under which his adversary's attack or pursuit is legally justified." (*Ibid*.) Because, in that situation, the defendant cannot invoke perfect self-defense, it follows that the defendant also cannot invoke imperfect self-defense. (*Ibid*.) The principle, stated more generally in *Valencia*, is, "not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense." (*Ibid*.)

Temple argues the example from *Valencia* limits the loss of an imperfect self-defense claim to the situation in which the defendant engaged in wrongful conduct which renders the adversary's attack justified. *Valencia* is not so narrow. From the general principle given in *Valencia* can be drawn a corollary that use of more force than was reasonably necessary to defend against the danger defeats a claim of perfect self-defense. The same would apply to imperfect self-defense because the difference between self-defense and imperfect self-defense is the reasonableness of the belief in the need to defend, not the amount of force permitted to repel the attack. Thus, as *Valencia* explained, "if [a] defendant had unreasonably believed [the victim] was going to punch him in the arm and stabbed him to death in response, this belief would not support a claim of imperfect self-defense for the reason

16

that the belief, even if reasonable, would not permit the use of deadly force." (*People v. Valencia, supra*, 43 Cal.4th at p. 288, fn. 6.)

In *People v. Morales* (2021) 69 Cal.App.5th 978, 995, the defendant, who had been convicted of second degree murder, challenged a jury instruction on voluntary manslaughter based on imperfect self-defense. The defendant contended the imperfect self-defense instruction failed to tell the jury that imperfect self-defense reduces murder to voluntary manslaughter when the defendant's beliefs in imminent danger and the need to use deadly force are reasonable, but the defendant uses excessive force to repel the attack. (*Ibid*.) Citing *Valencia*, the court in *Morales* concluded: "[I]f [the defendant] reasonably believed he needed to use force against [the victim] but used more force than was necessary, then he could not claim perfect self-defense. As a result, he cannot claim imperfect self-defense, either." (*Morales,* p. 995.) "The relevant consideration is whether a defendant uses more force than is necessary to repel an attack, not the type of deadly force used by a defendant." (*Id.* at p. 996.)[3]

---

[3] On a related issue, *People v. Schuller* (2021) 72 Cal.App.5th 221 holds that failure to instruct on voluntary manslaughter altogether can be harmless error based on the evidence of defendant's response to the perceived threat. The defendant in *Schuller* was convicted of first degree murder. (*Id.* at p. 224.) The Court of Appeal concluded the trial court erred by refusing to instruct on voluntary manslaughter based on imperfect self-defense. (*Id.* at p. 236.) The error was harmless, however, "given the overwhelming evidence that defendant was not acting in any form of self-defense." (*Id.* at p. 238.) For instance, while the defendant claimed he shot the victim because the victim came at him with a knife, the knife was found on a table, not the floor, and had no blood on it. (*Id.* at pp. 227–228, 234, 240.) The defendant shot the victim nine times on the left side of his face and head, and some wounds were "'closely grouped,'" which indicated the defendant acted out of a "personal motive, rather than panicked self-defense." (*Id.* at p. 240.)

Although killing an attacker might be reasonably necessary to defend, self-defense, whether perfect or imperfect, it is not a license to kill. Even when faced with imminent fear of death, a person may only use force reasonably necessary to repel the attack, and "only as long as the danger exists or reasonably appears to exist." (*Clark, supra,* 201 Cal.App.4th at p. 250.) A defendant who had an actual and reasonable belief in being in imminent danger of death, but used more force than was reasonably necessary to repel the attack, or continued to use force after the danger no longer existed or reasonably appeared to exist, may not invoke self-defense.

With one modification, the same rule would govern imperfect self-defense: A defendant who had an actual but unreasonable belief of being in imminent danger of death, but used more force than was reasonably necessary to repel the attack, or continued to use force after the danger no longer existed or was actually believed by the defendant to exist, may not invoke imperfect self-defense.

3. The Evidence Shows that Temple Used Excessive Force

In addressing the evidence, we start with the premise that Temple had an actual belief that Deschepper had tried to kill him. The evidence of the basis for that belief was as follows: Temple told deputy Churchill that Deschepper had run up to Temple as he stood by his car and asked, "where are we going?" According to Temple, as he was opening the car door, Deschepper punched him in the left side of his face. Temple fell back. In an interview with investigator Bishop and detective Navarette, Temple said that Deschepper then "pummeled" him "with perpetual blows," causing Temple to lose consciousness and fall to the ground.

Temple's response was far more than was reasonably necessary to repel Deschepper's attack. Temple's belief that Deschepper was trying to kill

18

him was based on Deschepper punching him, yet Temple responded by attacking Deschepper with a knife with a six-inch blade. Deschepper was unarmed, a fact that would have been readily known by Temple. Indeed, Temple never said that he saw Deschepper with a knife or any other kind of weapon.

Deschepper tried to retreat across the parking lot. But Temple, despite Marquez's efforts to stop him, doggedly pursued Deschepper. At about the halfway point, after twice saying "he's stabbing me," Deschepper fell to the ground. Temple got on top of Deschepper and continued to stab him while he was down. Deschepper was not fighting back. Marquez testified that while Deschepper was on the ground facing down, Temple used both hands to thrust the knife, execution style, downward into Deschepper. By that time the attack had long since been repelled. Once Marquez managed to kick Temple off of Deschepper, Temple got up and walked away.

Jerrad Drellishak, who viewed the incident from the motel balcony, testified he saw Deschepper fall to the ground and Temple sit on top of Deschepper, who was face down, and repeatedly stab him in the back. Drellishak testified he saw Temple lift his knife above his head and bring it down on Deschepper. Sarah Emmitt also testified she saw Deschepper on the ground "getting stabbed" by Temple and Marquez trying to stop him.

The motel surveillance video captures Deschepper retreating across the parking lot with Temple following him and Marquez trying to stop Temple. The surveillance video shows Deschepper falling to the ground and Temple climbing on top of Deschepper and stabbing him. The video shows Marquez making what appears to be a kicking motion after which Temple gets up and walks away.

19

The autopsy revealed that Deschepper had suffered five stab wounds, more than it seems would have been necessary to repel his attack. Deschepper's hands had no bruises or other visible injuries indicating either hand had been used to punch somebody. Temple's only injuries were a cut to his hand caused by his own knife and a nonspecific injury to a knee.

In addition, there is evidence that Temple was angry with Deschepper. Drellishak testified that in the motel room Temple was upset with Deschepper for being disrespectful. Temple said he had a knife with a 12-inch blade and "people wouldn't be so disrespectful if they knew about it."

Given this evidence, there is no reasonable probability the outcome in this case would have been different if the trial court had expressly instructed the jury that it could consider Temple's mental condition in determining imperfect self-defense.

Although a defendant is not required to retreat and may pursue an assailant until the danger of injury has passed (*Clark, supra*, 201 Cal.App.4th at p. 250), "a reasonable opportunity to retreat may defeat a claim of perfect *or imperfect self-defense* because 'the opportunity to retreat means that no use of force was reasonable'" (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 181, italics added). Temple had several opportunities to retreat. Based on Marquez's testimony, Temple could have retreated near the beginning of the encounter when Marquez had her arms around Deschepper. Temple could have retreated at any time while Deschepper retreated across the parking lot. Temple could have retreated when Deschepper fell to the ground. Temple never retreated.

A defendant may use force only so long as the danger exists or reasonably appears to exist. (*Clark, supra*, 201 Cal.App.4th at p. 250.) The evidence showed as early as the point in time when Deschepper began

20

retreating across the parking lot, Temple was not in imminent danger of death or bodily injury and no danger would have reasonably appeared to exist. By the time Temple climbed on top of Deschepper and stabbed him, any belief by Temple in the need to defend himself would have been purely delusional. (See *People v. Elmore* (2014) 59 Cal.4th 121, 130, 146 ["the doctrine of unreasonable self-defense is [not] available when belief in the need to defend oneself is entirely delusional"].)

## II.

### THE TRIAL COURT DID NOT ERR BY GIVING CALCRIM NO. 225 INSTEAD OF CALCRIM NO. 224

Temple argues the trial court erred and violated his constitutional rights by instructing the jury with CALCRIM No. 225 (Circumstantial Evidence: Intent or Mental State) instead of CALCRIM No. 224 (Circumstantial Evidence: Sufficiency of Evidence). We find no error.

CALCRIM No. 224 instructs the jury on when it may rely on circumstantial evidence to conclude a fact necessary to prove the defendant's guilt has been proved.[4] CALCRIM No. 225 instructs the jury on when it may

---

[4] CALCRIM No. 224 states in relevant part: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence."

rely on circumstantial evidence to conclude the defendant had the required mental state for the offense charged.[5]

CALCRIM No. 224 is applicable "only when the prosecution substantially relies on circumstantial evidence to establish any element of the case." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171.) "CALCRIM No. 225 is to be used in place of CALCRIM No. 224 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.'" (*Ibid.*) The Bench notes to CALCRIM No. 224 advise, "[i]f intent is the only element proved by circumstantial evidence, do not give this instruction." (Judicial Council of Cal. Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 224, p. 53.) The bench notes to CALCRIM No. 225 advise: "Give this instruction when the defendant's intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence. If other elements of the offense also rest substantially or entirely on circumstantial evidence, do not give this instruction. Give CALCRIM No. 224." (*Id.*, Bench Notes to CALCRIM No. 225, p. 55.)

As the Attorney General argues, the prosecution in this case only relied on circumstantial evidence to prove Defendant's intent or mental state.

---

[5] CALCRIM No. 225 states, in relevant part: "The People must prove not only that the defendant did the act[s] charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required. [¶] A[n] (intent/ [and/or] mental state) may be proved by circumstantial evidence. [¶] . . . [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state)."

The only circumstantial evidence identified by Temple as having been relied on by the prosecution was the surveillance video. Temple argues, "[a]lthough there was surveillance video of the charged incident, there were missing frames in various portions of the footage due to the fact the cameras were motion-activated, and because of the poor resolution of the video combined with the missing frames, it is not entirely clear what occurred during the incident."

The surveillance video was direct evidence, not circumstantial evidence. (*People v. Lund* (2021) 64 Cal.App.5th 1119, 1151 ["the videos were not merely circumstantial evidence like a crime scene in a murder case, but rather constituted direct evidence of one of the elements of the . . . charge"]; cf. *People v. Hunter* (2011) 202 Cal.App.4th 261, 272 ["The district attorney also pointed out that the video provided direct, not circumstantial, evidence that the gun was real".) We have watched the surveillance video and find that neither the picture resolution nor the few seconds of missing frames would have prevented the jury from understanding what was happening.

III.

THE TRIAL COURT DID NOT ERR BY DENYING TEMPLE'S MOTION
FOR A CONTINUANCE

Temple argues the trial court erred by denying his motion to continue trial for an indefinite period of time so that he could locate a witness, Amanda Ardrey, who had been placed on call by the trial court. Temple claims Ardrey was a material witness and previously had been cooperative.

The prosecution filed the complaint against Temple in December 2019. Trial was delayed for several years for a variety of reasons, including the COVID-19 pandemic and requests from both sides to continue or trail

23

trial. Court minutes show that on November 5, 2021, a bench warrant was issued as to Ardrey.

Ardrey was personally served with a subpoena in March 2022. She appeared in court on March 30, 2022 and was ordered to be "on call." She agreed.

Trial was finally set to commence on October 20, 2022. On October 18, defense counsel brought a motion to continue trial to a date "agreeable with the court" on the ground that counsel had been unable to contact Ardrey and advise her of the trial date.

When the motion for a continuance was heard on October 20, 2022, Defense counsel stated he had maintained contact with Ardrey as the case had been continued and she had been cooperative, but he had lost contact with her since September 30, 2022. Calls to Ardrey started going to voicemail. When the court asked whether defense counsel had retained an investigator to find Ardrey, counsel responded that she lived in Colorado. The court told defense counsel that because Ardrey was a material witness who lived out of state, counsel should have asked the court to order her appearance. The court found there was not good cause to continue trial but noted that no courtrooms were available. The court continued the trial to the next day and granted defense counsel's request to issue a warrant for Ardrey's arrest.

On October 21, 2022, defense counsel renewed the motion to continue trial. The court again found lack of good cause and denied the renewed motion. The court trailed the trial to October 24. On October 24 the court asked defense counsel what additional efforts had been made to locate Ardrey. Counsel stated he had learned that Ardrey's telephone number was no longer valid. The court trailed the matter to October 25, 2022.

24

On October 25, defense counsel renewed the request to continue trial on the same grounds made for the initial motion. Counsel argued that Ardrey was a material witness and was the only witness who had seen the first moments of the altercation between Temple and Deschepper. The trial court again denied the request for a continuance and commented: "[W]e may be in the same position in a month from now or six months from now or a year from now. There is no guarantee that we will ever get this witness into court."

Jury selection began on October 31, 2022, the first witness was called on November 1, and closing arguments began on November 8. There is nothing in the record to indicate defense counsel undertook any efforts to locate Ardrey during that time period.

"A criminal trial may be continued only for good cause." (*People v. Garcia* (2011) 52 Cal.4th 706, 758.) A trial court has broad discretion in deciding whether good cause has been shown to grant a trial continuance. (*People v. Alexander* (2010) 49 Cal.4th 846, 934.) "Particularly, when the party seeks a continuance to secure a witness's testimony, the party must show that he exercised due diligence to secure the witness's attendance, that the witness would be available to testify within a reasonable time, that the testimony was material and not cumulative." (*People v. Henderson* (2004) 115 Cal.App.4th 922, 934.) "[I]f the supporting affidavits do not show where the desired witness is and that his testimony can be obtained within a reasonable time it is not an abuse of discretion in the court to refuse to grant a continuance." (*People v. Collins* (1925) 195 Cal. 325, 333.)

The motion for a continuance and declaration of defense counsel did not show where Ardrey might be found or offer any estimate of the time necessary to find her. The declaration stated only that "I need to request to

25

continue this matter so that I can do what is necessary to gain Ms. Ardrey's compliance with the 'on call' agreement." The court correctly perceived "[t]here is no guarantee that we will ever get [Ardrey] into court." The trial court did not abuse its discretion by denying what amounted to a request for a continuance of "indefinite duration" and "of limited apparent utility." (*People v. Reed* (2018) 4 Cal.5th 989, 1005.)

DISPOSITION

The judgment is affirmed.

SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


DELANEY, J.

26